UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   13-20179-CR-LENARD

UNITED STATES OF AMERICA

vs.

ADOLFO LEON AFANADOR-TABARES,
        Defendant.
_____/

## FACTUAL PROFFER

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt:

Beginning in January 2010, the Drug Enforcement Administration (DEA) began a long-term money laundering investigation that used undercover bank accounts, as well as a number of confidential informants, to obtain money-laundering contracts from a drug trafficking organization headed by Raul GIL-TABARES.  This organization was based out of Cali, Colombia.  The money laundering contracts were given to various confidential informants that posed as money laundering brokers.  The money contracts the confidential informants received required the informants to receive and distribute drug proceeds, in order to move those drug proceeds from various parts of the United States and Mexico back to Cali, Colombia.

The investigation revealed that the GIL organization was a major mover of multi-kilogram loads of cocaine from Cali to Mexico and Central American countries, where the drugs were either sold to Mexican groups for distribution, or sent overland to the United States across the southwest border.  The drugs were distributed in cities such as Chicago, New York, and Atlanta, and the money laundering contracts required that the DEA, acting in an undercover capacity, retrieve the

drug proceeds in those cities and send the money back to Colombia. The confidential informants, in accepting the contracts on behalf of the DEA, relayed information on where the drug proceeds would have to travel or be wire transferred before it could be moved or transferred to Miami and ultimately Colombia. The drug proceeds were often picked up in bulk cash deliveries, and upon arrival in Miami, the informants would receive instructions from members of the money laundering organization to send the money back to South America and Central America either via wire transfer, the Black Market Peso Exchange ("BMPE"), Hawala system or "Dondo y Dondo" systems, or via bulk cash drops to various couriers who would be provided with codes that would let the informant or undercover know that they were dealing with the correct person.

Under the BMPE system, the money laundering organization would provide the informants with the names of businesses, primarily import/export companies and electronics or cellphone companies in Miami. The informant would then be instructed to deliver various quantities of the drug proceeds to those businesses with the instruction that the business would receive the order at a later time. The various businesses then received orders from a member of the money laundering organization, and the business would either order or ship the equivalent in merchandise back down to Colombia. There, the merchandise would be sold, and the money would be delivered to the DTO.

Under the Hawala system, or "Dondo y Dondo" system, the money laundering organization would provide the informants with the names of either businesses or individuals to give the money to. Upon receipt of the money, a separate money broker in Colombia released the equivalent amount in pesos to the GIL organization in Colombia. The money broker in charge of the Hawala system then used the money received in the United States to either pay off debts or used the BMPE

to ultimately get the money back down to Colombia.

The investigation revealed that GIL would offer money laundering contracts to money laundering brokers through his cousin, Adolfo AFANADOR-TABARES, a/k/a "Fino." AFANADOR would offer the money laundering brokers the contract, the commission the brokers would earn, and the location and contact information for where the money was located. Orlando GUAPACHA-QUINTERO, a/k/a "Pollo," ("GUAPACHA") and Yesid ZAMBRANO-GARAVITO, a/k/a "Maco," ("ZAMBRANO") were two of the money laundering brokers who received money laundering contracts from the GIL organization.

In August 2010, a DEA confidential source received a contract to move approximately $554,360 from ZAMBRANO, who received the money laundering contract from AFANADOR and the GIL drug trafficking organization. ZAMBRANO provided the confidential source with the instructions on where to pick up the money. On August 6, 2010, the DEA picked up the money from three individuals in New Jersey. A narcotics K-9 alerted to the presence of narcotics on the money. On August 9, 2010, ZAMBRANO provided the confidential source with the instructions on where to deliver the money. These instructions included bulk cash drops to individuals and businesses in the Miami area, and ZAMBRANO provided the confidential source with the phone numbers and code phrases to be used when making these deliveries. ZAMBRANO also instructed the confidential source to make a number of wire transfers, which the DEA did through the use of their undercover bank account in Miami.

In February 2011, a DEA confidential source received a contract to move approximately one million dollars from ZAMBRANO. The money was located in Mexico, and according to communications from ZAMBRANO, the money was part of forty million dollars located in

3

Mexico that belonged to the GIL organization from the shipment of 5,000 kilograms of cocaine. When ZAMBRANO became frustrated with the confidential source for the delay in moving the money, GUAPACHA received the contract. GUAPACHA offered a subcontract to the same confidential source, who agreed to move the money for GUAPACHA.

GUAPACHA provided the confidential source with a contact number and code for the person the confidential source needed to retrieve the money from in Mexico. The DEA used this contact number and code to arrange to pick up the narcotics proceeds in Mexico. On March 2, 2011, Mexican law enforcement working with the DEA received approximately $990,900 from an unidentified individual in Mexico City. The money was then transported by the DEA to Miami, Florida. The confidential source received further instructions to deliver bulk cash to an individual in Panama and an individual in Bogota, Colombia. On March 14, 2011, Colombian law enforcement working with the DEA delivered $400,000 to an unidentified individual in Bogota. On March 15, 2011, Panamanian law enforcement working with the DEA delivered $524,900 to an unidentified individual in Panama City. The confidential source also received instructions to wire transfer approximately $5,000 to a bank account in Turkey, which was done on March 18, 2011 from the undercover bank account in Miami. GUAPACHA later confirmed with the confidential source that the funds had been successfully moved to Colombia.

On March 5, 2011, the confidential source received another contract from GUAPACHA to move more of the GIL organization's drug proceeds from Mexico to Colombia for a commission of seven percent. The confidential source was provided with the contact information and code for the contact person in Mexico who was holding the drug proceeds. Mexican law enforcement working with DEA retrieved $1,839,960 in bulk cash from an unidentified individual in Mexico.

This money was then transported by the DEA to Miami. The confidential source then received instructions to deliver some of the money to individuals and to wire transfer some of the money from the undercover bank account in Miami. On March 10, 2011, an undercover DEA agent delivered $60,000 of the money to an identified individual in Miami, Florida, per instructions received by the confidential source. Panamanian law enforcement also delivered $200,000 to an unidentified individual in Panama City on March 17, 2011, pursuant to instructions received by the confidential source. Finally, a series of wire transfers from the undercover bank account to a bank account in Lebanon and a bank account in Guatemala were conducted, pursuant to instructions received by the confidential source.

Additionally, on March 5, 2011, pursuant to communications with the Mexican contact that GUAPACHA had provided to the confidential source, the DEA undercover bank account in Miami received wire transfers totaling $1,848,325.66. The confidential source then received a number of instructions to wire transfer the money from the undercover bank account in Miami to various bank accounts in Guatemala. Additionally, the confidential source was instructed to make two bulk cash deliveries of $700,000 and $612,000 to unidentified individuals in Panama City, Panama.

Also in early March 2011, the confidential source received a different money contract from ZAMBRANO to launder approximately $300,000 in drug proceeds. During these contract discussions, a second confidential source was introduced to ZAMBRANO over the phone. The second confidential source had a number of recorded conversations with ZAMBRANO to discuss the money laundering contract and receive the instructions and contact numbers for the individuals who were to deliver the money and receive the money. ZAMBRANO instructed the confidential

source to contact Carlos CAMACHO about retrieving approximately $300,000 in early March.

On March 4, 2011, the confidential source received instructions to receive the $289,980 at the Courtyard Marriott Hotel at the Dolphin Mall. On that date, the confidential source had a number of consensually recorded phone conversations with CAMACHO to arrange the delivery. In the phone calls, CAMACHO indicated that he was driving south to Miami to deliver the money to the confidential source. At approximately 6:00 pm, the confidential source used a digital recorder to record the meeting with CAMACHO. This meeting was also observed by law enforcement. During the meeting, CAMACHO informed the confidential source that there were "290" for the confidential source to take, and then CAMACHO counted the money for the confidential source. The confidential source told CAMACHO to be careful because there were police in the area, and CAMACHO indicated that the confidential source should call the "man down there" to get the phone numbers on where to deliver the money. The confidential source retrieved what was later discovered to be $289,980 in a suitcase from CAMACHO'S black Nissan.

After receiving instructions from ZAMBRANO, the DEA then conducted a number of money drops to various individuals and businesses in the Miami area. These deliveries were observed by law enforcement conducting surveillance. After this contract was fulfilled, the DEA-Bogota Office was able to assist the Colombian vetted CTI-Unit with obtaining judicially authorized wiretaps for ZAMBRANO, ZAMBRANO'S son HEMBERG, and GUAPACHA.

On March 25, 2011, ZAMBRANO gave the confidential sources a contract to retrieve approximately $500,000 from Atlanta. ZAMBRANO agreed to give the confidential sources a commission of four percent of the funds laundered. ZAMBRANO provided the confidential sources with the contact number and code to pick up the money. On March 25, 2011, an

undercover agent in the Atlanta Field Division picked up money from Fernando Lopez a/k/a "Kuwala." However, instead of the $500,000 originally agreed upon, the amount of money received was $1,995,490. The confidential source contacted ZAMBRANO and specifically asked if all of the money was to be laundered. From March 29, 2011, through April 27, 2011, ZAMBRANO instructed the CS to launder all of the money, and ZAMBRANO provided the names and phone numbers of individuals and businesses where the money was to be delivered. Based upon ZAMBRANO'S instructions, the DEA delivered bulk money to individuals and businesses in Miami, and numerous wire transfers to bank accounts in Hong Kong and the Middle East were made pursuant to ZAMBRANO'S directions from the DEA undercover bank account.

In later judicially authorized interceptions of ZAMBRANO'S cellphone by the Colombian CTI vetted-unit, Marco RAMIREZ-Gomez, a/k/a "Tono" was intercepted discussing the money pickup in Atlanta. Based upon the intercepted phone calls, RAMIREZ was another money broker that had contracted for the additional $1.5 million dollars turned over in Atlanta. In their discussions, ZAMBRANO and RAMIREZ agreed that since the Atlanta drug organization had turned over all of the money to ZAMBRANO'S contractors, that ZAMBRANO should continue to launder the money down to Colombia with the instructions that RAMIREZ would provide the instructions as to who, where, and when the money would be delivered.

On April 4, 2011, the confidential source received a contract from ZAMBRANO and Orlando GUAPACHA to move a million dollars from Mexico to Colombia for the GIL organization. The million dollars were part of the proceeds resulting from the sale of 5,000 kilograms of cocaine, which ZAMBRANO told the confidential source about in February 2011. GUAPACHA provided the confidential source with the contact information for the individual in

7

Mexico who held the drug proceeds. Pursuant to communications with those individuals, Mexican law enforcement working with the DEA retrieved $1,079,870 from two unidentified individuals in Mexico. The money was then transported by the DEA to Miami. The confidential source then received instructions to do a number of bulk cash deliveries in Panama City, Panama, where some of that money was ultimately seized by law enforcement. The confidential source also received instructions to deliver approximately $3,000 to an identified woman in Miami, Florida.

On June 15, 2011, the confidential source was contacted by ZAMBRANO about a contract to retrieve and launder one million dollars in drug proceeds from Atlanta via Miami. The confidential source received his communications from ZAMBRANO over blackberry PIN messaging. ZAMBRANO provided the phone number for the individual that the CS could pick the money up from in Atlanta, and the confidential source and ZAMBRANO agreed to a commission of five percent. On June 17, 2011, the DEA in Atlanta used an undercover to pick up the money in Doraville, Georgia, from two unknown men. When the money was actually counted, the total amount received was actually $499,855. When the confidential source informed ZAMBRANO of this fact, ZAMBRANO acknowledged the amount and stated via text message that another $500,000 would be delivered later. However, this additional money was never given to the confidential source. The DEA used a narcotics K-9 unit to conduct an open-field sniff test, and the K-9 unit positively alerted to the presence of narcotics on the money. ZAMBRANO provided instructions for the money to be wired to bank accounts in Florida, California, China, and Barcelona. An additional $226,155 was seized by the DEA.

On June 16, 2011, ZAMBRANO requested that the confidential source receive and launder

$500,000 in narcotics proceeds for a commission of five percent. Through email, blackberry messaging, and recorded phone conversations, ZAMBRANO provided the confidential source with the phone number of the individual that would deliver the drug proceeds. Based upon those instructions, the DEA retrieved $428,243 from a Francisco Castanos in Chicago. This money was counted, and the amount was relayed to ZAMBRANO. The DEA used a narcotics K-9 unit to conduct an open field sniff test, and the K-9 unit positively alerted to the presence of narcotics on the money. The DEA then seized the full amount at that time.

In late June 2011, ZAMBRANO requested that the confidential source move an additional two million dollars from Mexico City, Mexico. Pursuant to ZAMBRANO'S instructions, Mexican law enforcement working with DEA received $1,926,333 in Mexico City. The money was transported to Miami, and ZAMBRANO provided instructions on where to deliver and wire transfer the money. At that time, the DEA seized the full amount.

Colombian law enforcement, pursuant to judicialized wiretaps in Colombia, intercepted a number of communications from GUAPACHA, ZAMBRANO, AFANADOR-TABARES, and others that revealed their involvement in the money laundering conspiracy. Additionally, the DEA interviewed GUAPACHA in Colombia. During these interviews, GUAPACHA admitted his involvement in the money laundering conspiracy with GIL, AFANADOR-TABARES, and others, to move drug proceeds back to Cali, Colombia. GUAPACHA agreed to cooperate and made a number of video and audio recordings with AFANADOR-TABARES and GIL where they discussed money laundering contracts and the movement of the drug proceeds ~~from Mexico and the United States back~~ to Colombia. GUAPACHA also pled guilty and agreed to cooperate. GUAPACHA would have testified that AFANADOR-TABARES was responsible for offering the

9

contracts to move the drug proceeds from Mexico, the United States, and elsewhere back to Colombia. GUAPACHA would also have testified that AFANADOR-TABARES did this on behalf of GIL and the drug trafficking organization.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 11/19/14        By: _____
                          BRIAN DOBBINS
                          ASSISTANT UNITED STATES ATTORNEY

Date: 11/19/14        By: _____
                          DAVID A. NUNEZ, ESQ.
                          ATTORNEY FOR DEFENDANT

Date: 11/19/14        By: _____
                          ADOLFO AFANADOR-TABARES
                          DEFENDANT

10